## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| WARREN RESOURCES, INC., *et al.*, [1] | § | Case No. 16-32760 (MI) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

### DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, James A. Watt, hereby declare:

1.      I am the President, Chief Executive Officer and Chief Restructuring Officer of Warren Resources, Inc. ("Warren"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company").  In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, capital structure, organization, financial affairs, legal and regulatory matters and books and records.

2.      On the date hereof (the "Petition Date"), Warren and five (5) of its subsidiaries each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").  The entities continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors filed a motion seeking joint administration of these

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Warren Resources, Inc. (4080); (ii) Warren E&P, Inc. (4052); (iii) Warren Resources of California, Inc. (0072); (iv) Warren Marcellus, LLC (0150); (v) Warren Energy Services, LLC (4748); and (vi) Warren Management Corp. The Debtors' service address is: 11 Greenway Plaza, Suite 3050, Houston, Texas 77046.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.*, **IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

3.     I submit this declaration (this "<u>First Day Declaration</u>") to provide an overview of the facts and circumstances surrounding these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first day" motions (each, a "<u>First Day Motion</u>," and collectively, the "<u>First Day Motions</u>").  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management team and advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.     The dramatic decline in oil and gas prices and sustained depressed state of the energy industry has put a significant strain on the Debtors' revenues and liquidity, preventing the Company from developing its oil and gas assets and making it difficult for the Company to service its debts.  To address these issues, the Company has undertaken certain cost cutting measures, including reducing its staffing, lowering operating expenses where possible and reducing its capital program.  The Debtors also retained restructuring professionals to assist with assessing the Company's options.

5.     With the help of their advisors, the Debtors entered into negotiations regarding possible restructuring alternatives with their key stakeholders:  (a) GSO Capital Partners LP (the "<u>Plan Sponsor</u>"), which advises or sub-advises funds that hold substantially all of the claims

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

2

under the Debtors' $248-million prepetition first lien term loan facility; (b) Claren Road Asset Management LLC ("Claren Road"), which, on information and belief, holds substantially all of the outstanding obligations under the Debtors' prepetition second lien term loan facility; and (c) an ad hoc group of holders of the Debtors' 9.000% senior unsecured notes (the "Ad Hoc Committee") in the aggregate prinicpal amount of approximately $167.3 million.

6.     The Debtors negotiated with its constituents, both globally and unilaterally, for several months over various options for a consensual restructuring.  These discussions resulted in an agreement in principal among Debtors, Plan Sponsor and Ad Hoc Committee for a comprehensive balance sheet restructuring through a chapter 11 plan that includes consensual use of the Prepetition First Lien Lenders' cash collateral and agreement from the Plan Sponsor to provide debtor-in-possession financing up to $20 million.  The agreement is memorialized by the restructuring support agreement (the "Restructuring Support Agreement"), a copy of which is attached hereto as **Exhibit "A."**  Specifically, as more fully described in the Restructuring Support Agreement and exhibits thereto, the terms of the restructuring provided for the following:

- Conversion of the claims of the Prepetition First Lien Lenders into 82.5% of the equity (subject to dilution by the management incentive plan) in the reorganized debtors and a new first lien secured term exit facility not to exceed $130 million plus, at the Plan Sponsor's option, the amount outstanding under the DIP Facility.

- Conversion of the claims of the Prepetition Second Lien Lenders (Claren Road), holders of the Senior Notes, and the claim of Citrus Energy into the remaining 17.5% of the equity (subject to dilution by the management incentive plan) in the reorganized debtors, *pro rata* based on the amount of their respective claims.

- Other general unsecured creditors will receive a discounted cash payment or notes equal to the economic value of the equity being provided to the Prepetition Second Lien Lenders, holders of Senior Notes and Citrus Energy.  For example, if

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

3

recovery to the Prepetition Second Lien Lenders (Claren Road) and holders of Senior Notes is 3%, the economic recovery to allowed general unsecured claims will be 3%.

- Existing equity in Warren will be cancelled and receive no further payments or recovery.

The Debtors believe that the Prepetition First Lien Lenders are significantly impaired and that the Prepetition Second Lien Lenders are completely unsecured. The proposed restructuring will allow the Company to emerge from bankruptcy in a healthier financial position, able to service its debts and fund its operations going forward.

7.    To familiarize the Court with the Debtors and the relief they will seek on the first day of these chapter 11 cases, this First Day Declaration is organized as follows:  Part I describes the Debtors' corporate history, business operations, and prepetition organizational and capital structure.  Part II describes the events leading to the commencement of these chapter 11 cases. Finally, Part III sets forth the relevant facts in support of each First Day Motion.

## I.    The Debtors Corporate History and Assets, Business Operations, and Organizational and Prepetition Capital Structure.

### A.    Corporate History

8.    Warren and its subsidiaries are an independent oil and natural gas exploration and production company engaged in the acquisition, exploration, development and production of domestic onshore crude oil and gas reserves.  The Company's oil and gas properties are located in three geographic areas.  The Company's oil development activities are primarily focused on waterflood oil recovery operations in the Wilmington Field (California) and the North Wilmington Unit (California) outside of Los Angeles.  The Company also develops coalbed methane natural gas ("CBM") in the Rocky Mountain region, focusing on the Washakie Basin in

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

4

southwestern Wyoming.  Lastly, the Company has a position in the Marcellus shale in a highly

prolific area in northeastern Pennsylvania which produces dry natural gas.

9.      The following chart depicts Warren's organizational structure:



10.     <u>Warren Resources, Inc.</u>  Debtor Warren, a Maryland corporation, is a publically

traded company and is the ultimate parent company of the Debtors.   It owns approximately 99%

of the Company's Wyoming oil and gas leases and wells in Wyoming.  It also owns 100% of the

equity in the other Debtors.

11.     <u>Warren Resources of California, Inc. ("Warren California")</u>.   Debtor Warren

California is a California corporation and is a wholly owned subsidiary of Warren.  It owns 99%

of the Company's oil and gas leases and wells in California, as well as the Company's assets and

equipment located in California.

12.     <u>Warren E&P, Inc. ("Warren E&P")</u>.   Debtor Warren E&P is a New Mexico

corporation and a wholly owned subsidiary of Warren.  It owns the remaining 1% interest of the

Company's California oil and gas leases and wells and the remaining 1% interest of the

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

5

Company's Wyoming oil and gas leases and wells, and serves as the operator of the Company's oil and gas assets. It also operates the drilling rig used in the California operations.

13.     <u>Warren Energy Services, LLC. ("Warren Energy")</u>  Debtor Warren Energy is a Delaware limited liability company and a wholly owned subsidiary of Warren. Warren Energy owns and operates 100% of the Company's midstream assets used in its Wyoming operations, which includes a compression and dehydration facility and a 59 mile pipeline.

14.     <u>Warren Marcellus LLC ("Warren Marcellus").</u>  Debtor Warren Marcellus is a Delaware limited liability company and a wholly owned subsidiary of Warren. Warren Marcellus owns 100% of the Company's Pennsylvania Marcellus oil and gas leases, wells and facility assets.

15.     <u>Warren Development Corp.</u>  Non-Debtor affiliate Warren Development Corp. is a Delaware corporation and wholly owned subsidiary of Warren. Warren Development Corp. was established to pursue certain joint venture opportunities, none of which came to fruition. Warren Development Corp. has no employees, assets and/or operations.

16.     <u>Warren Management Corp.</u>  Debtor Warren Management Corp. is a Delaware corporation and wholly owned subsidiary of Warren. Warren Management Corp. was established to pursue certain joint venture opportunities, none of which came to fruition. Warren Management Corp. has no employees, assets and/or operations.

17.     <u>Warren Drilling Corp.</u>  Non-Debtor affiliate Warren Drilling Corp. is a New Mexico corporation and wholly owned subsidiary of Warren. Warren Drilling Corp. was established to pursue certain joint venture opportunities, none of which came to fruition. Warren Drilling Corp. has no employees, assets and/or operations, and is not a debtor.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

6

**B.      Areas of Development Activity**

18.      The Company's assets are primarily focused on waterflood oil recovery projects in the Wilmington field in California, coalbed methane projects in Wyoming and the Marcellus Shale dry natural gas project in Pennsylvania.  Below is a map showing the various locations of the Company's operations:



19.      The table below highlights the Company's acreage positions in its main areas of activity as of December 31, 2015:

| Area | Gross Acres | Net Acres | Net Undeveloped Acreage |
|---|---|---|---|
| Atlantic Rim Project, Wyoming | 90,777 | 70,544 | 47,705 |
| Wilmington Field, California | 2,476 | 2,460 | 1,084 |
| Marcellus, Pennsylvania | 6,513 | 5,288 | 2,608 |
| Pacific Rim Project, Wyoming | 197 | 87 | 87 |
| Other(1) | 6,372 | 2,167 | 1,477 |
| Total | 106,335 | 80,546 | 52,961 |

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

### 1.   California Projects

20.     The Company's operations in California are focused on the Wilmington field within the Los Angeles Basin, the third largest oilfield in the U.S.   The Company owns and operates wells in the Wilmington Townlot Unit and the North Wilmington Unit.   Below is a map showing the location of the operations in California:



21.     <u>Wilmington Townlot Unit.</u>  The Wilmington Townlot Unit ("<u>WTU</u>") is located in the Wilmington field within the Los Angeles Basin of California.   The WTU, a unitized oil field consisting of 1,440 gross (1,424 net) acres and has produced more than 150 million barrels of oil from primary and secondary production.   Warren California owns an approximate 99% undivided working interest in the WTU which is subject to the terms and provisions of a unit

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.,* **IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

8

operating agreement.  Warren E&P owns the approximate remaining 1% of the Company's working interest in the WTU and operates the wells and assets in the WTU.  As of December 31, 2015, there were 143 gross (141 net) producing wells.

22.     During December 2015, production from the assets in the WTU averaged 2,390 barrels of oil per day ("Bbls/d") gross, (1,937 Bbls/d net).  In addition, estimated proved reserves as of December 31, 2015 were 11.0 MMBbls[2] gross (9.0 MMBbls net), of which approximately 64% are proved developed producing ("PDP") or proved developed nonproducing ("PDNP"), and 36% are proved undeveloped ("PUD").

23.     North Wilmington Unit.  The North Wilmington Unit ("NWU"), a unitized oil field consisting of 1,036 gross acres, is located in the Wilmington oil field adjacent to the WTU. All working interests in the NWU are subject to the terms and provisions of a unit operating agreement under which Warren E&P serves as operator.  As with the WTU, Warren California owns a 99% working interest (with Warren E&P owning the remaining 1%) and an approximate 84.7% net revenue interest in the NWU, including existing wells, certain equipment and certain surface properties.  There are currently 42 gross and net producing wells in the NWU.

24.     During December 2015, production from the NWU averaged 521 Bbls/d gross, (442 Bbls/d net).  In addition, estimated proved reserves as of December 31, 2015 were 4.7 MMBbls gross (4.0 MMBbls net), of which 27% are PDPs and 73% are PUDs.

### 2.     Pennsylvania Marcellus Shale Project

25.     The Company's Pennsylvania assets are owned by Warren Marcellus and consists of a concentrated, contiguous acreage position located in Wyoming County, Pennsylvania in the

---

[2] The acronym "MMBbls" stands for one million barrels of oil or other liquid hydrocarbons.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

9

northeast portion of the Marcellus Shale.   Below is a map of the Wyoming County, Pennsylvania:



26.    Warren Marcellus operates approximately 6,512 gross (5,289 net) acres in the Lower Marcellus Shale and 6,512 gross (3,966 net) acres in the Upper Marcellus Shale.  Warren Marcellus holds an approximate 75% working interest and an approximate 60% net revenue interest in the Lower Marcellus assets and an approximate 56% working interest and 45% net revenue interest in these Upper Marcellus assets.  Warren Marcellus has 30 gross (22.5 net)

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

10

producing wells in the Lower Marcellus and 3 gross (1.7 net) producing wells in the Upper Marcellus.

27.     For the three months ended December 31, 2015, the Marcellus assets had net average gas production of approximately 63.9 MMcfe/d.[3]  Along with the existing wells, the Company has identified 24 additional drilling locations in the Lower Marcellus and 1 additional drilling location in the Upper Marcellus.  Estimated net proved reserves as of December 31, 2015 were 95.2 Bcfe, of which 92% are PDP.

### 3.     Atlantic Rim Project in the Washakie Basin, Wyoming

28.     The Company's Wyoming operations are focused on the Washakie Basin in southern Wyoming.   Below is a map showing the location of the Company's Wyoming operations:



---

[3] The acronym "MMcf/d" stands for one million cubic feet of natural gas at standard atmospheric conditions per day and is an industry standard for measurement of gas production.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

29.     <u>Washakie Basin.</u>  The Washakie Basin is located in the southeast portion of the Greater Green River Basin in southwestern Wyoming and represents the Company's largest acreage position.  As of December 31, 2015, Warren owned 90,777 gross (70,544 net) acres for CBM development in this area, of which 47,705 net acres were undeveloped.  Warren has 316 gross (199.1 net) producing wells in the Washakie Basin.  Additionally, this area contains approximately 140 gross identified potential drilling locations, primarily based on 80-acre well spacing.  As of December 31, 2015, the estimated gross recoverable proved reserves in this basin were 106.0 Bcf[4] (64.6 Bcf net) based on 80-acre well spacing.

30.     The net average gas production from Wyoming assets for the three months ended December 31, 2015 was approximately 11.5 MMcfe/d.

31.     In addition to this acreage, Warren has the right to drill and develop the deeper, conventional formations ("<u>Deep Rights</u>") in some, but not all, of the acreage in the Atlantic Rim area.  Warren owns approximately 60,217 gross (50,896 net) undeveloped acres of deep rights inside the Spyglass Hill Unit, and approximately 12,745 gross (8,054 net) undeveloped acres of deep rights outside the Spyglass Hill Unit, for a total of 72,961 gross (58,949 net) undeveloped acres in the entire Atlantic Rim area.  The acreage is primarily located in the southern portion of the Eastern Washakie Basin in Wyoming and is adjacent to and north of the Colorado border.

32.     <u>Atlantic Rim Project.</u>  The Company's Atlantic Rim project focuses on the Company's acreage in the eastern rim of the Washakie Basin. As of December 31, 2015, the Company had drilled a total of 316 wells as part of the Atlantic Rim Project. Currently, the Company is developing its acreage in the Atlantic Rim project within the Spyglass Hill Unit.

---

[4] The acronym "Bcf" stands for one billion cubic feet of natural gas at standard atmospheric conditions.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

33.     Warren is the operator for the U.S. Bureau of Land Management (the "BLM") approved Spyglass Hill Unit in the Atlantic Rim area.   The Spyglass Hill Unit covers approximately 113,290 total gross acres (the "Spyglass Hill Unit"), with the companies Atlantic Rim acreage included within the Spyglass Hill Unit (i.e., the Spyglass Hill Unit includes acreage not owned by the Company).   Warren also owns interests in undeveloped leases in the southern portion of the Atlantic Rim Project, which are prospective for multiple deep formations. These leases are held by operations or production, and are subject to other unit requirements.

34.     The Spyglass Hill Unit contains three Participating Areas in which all of Warren's producing wells in Wyoming are situated, being the Grace Point, Sun Dog and Doty Mountain Participating Areas. Below is a chart summarizing each of these three units:

| Participating Areas | Total Acres in Participating Area | Warren Gross Acres in Participating Area | Warren Net Acres in Participating Area |
|---|---|---|---|
| Grace Point | 6,362.13 | 6,082.13 | 5,157.11 |
| Doty Mountain | 11,494.67 | 10,334.67 | 9,118.40 |
| Sun Dog | 11,091.08 | 10,406.20 | 7,688.77 |
| Total | 28,947.88 | 26,823.00 | 21,964.28 |

35.     Currently, the Sun Dog Participating Area contains 113 wells.  During December 2015, production from 113 producing wells operated by Warren through Warren E&P averaged approximately 5,253 gross Mcf/d of gas and approximately 45,000 Bbls/d of water.  Based on a report from Netherland, Sewell & Associates, Inc. as of December 31, 2015, estimated proved reserves for the wells in the Sun Dog sub-area were 54.9 gross (31.3 net) Bcf.  Warren currently owns a working interest of approximately 69% in the wells drilled in the Sun Dog Participating Area.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

13

36.     The Doty Mountain Participating Area currently contains 81 CBM wells on 80-acre spacing operated by Warren through Warren E&P.  During December 2015, these wells were producing approximately 12,342 gross Mcf/d of natural gas and 32,000 Bbls/d of water.  Based on a report from Netherland, Sewell & Associates, Inc. as of December 31, 2015, estimated proved reserves for the wells in the Doty Mountain sub-area were 49.3 gross (32.0 net) Bcf.  Warren currently owns an approximate 79% working interest in the wells drilled in the Doty Mountain Participating Area

37.     The Grace Point Participating Area contains 51 CBM wells on 80-acre spacing operated by Warren through Warren E&P.  During December 2015, these wells produced approximately 760 gross Mcf/d of natural gas and 21,000 Bbls/d of water.  Based on a report from Netherland, Sewell & Associates, Inc. as of December 31, 2015, estimated proved reserves for the wells in the Grace Point Participating Area were 1.8 gross (1.3 net) Bcf.  Warren owns an approximate 81% working interest in the wells drilled in the Grace Point Participating Area.

38.     Lastly, the Catalina Unit is operated by Escalera Resources, Inc., and consists of 71 CBM wells. During December 2015, gross production from the Catalina unit averaged approximately 9,165 gross Mcf/d of natural gas and approximately 65,000 Bbls/d of water. Warren currently owns a non-operating working interest of approximately 13.4% in the Catalina Unit. Escalera Resources, Inc. is a chapter 11 debtor is a bankruptcy case in Denver.

### C.     Midstream Assets, Equipment and other Miscellaneous Assets

39.     The Company owns other oil and gas assets for which it is not the operator. Specifically, the Company also owns interest in oil and gas properties in New Mexico and Texas through Warren E&P.  In New Mexico, Warren E&P owns a working interest in 2 gross, .03 net

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

14

oil wells and 22 gross, 2.3 net gas wells.  These New Mexico wells cover 4,145 gross acres (660 net acres), of which 3,224 gross acres (465 net) are developed.  In Texas, Warren E&P owns a working interest in 10 gross, 2.6 net wells in East Texas.  This relates to 704 gross acres (176 net), all of which has been developed.  The Debtors also own an interest in certain assets in Wyoming for which it is not an operator.  The average monthly revenue from these assets not operated by the Debtors is approximately $54,000.

40.     The Company also owns midstream assets and equipment related to its operations.  Warren Energy owns a 100% interest in and operates the gas gathering, compression and pipeline midstream assets which serve the Atlantic Rim Project in Wyoming. The midstream assets consist of gathering and compression equipment and a 59-mile pipeline that transports gas from the gathering systems throughout the Spyglass Hill Unit area to the Wyoming Interstate Company (WIC) interstate gas transportation pipeline.   These midstream assets also include compression and dehydration facilities.

41.     Additionally, Warren E&P owns and operates a drilling rig which is on location at the Wilmington Townlot Central Facility in California.

42.     The Company also has several filed offices in each of its area of operation, with offices in California, Colorado and Pennsylvania.  Each of these offices contains miscellaneous office assets and related equipment.

### D.     Crude Oil and Natural gas Marketing

43.     The following table summarizes the Company's net natural gas and oil production volumes, average sales prices and expenses for the periods indicated. The production is attributable to the Company's direct interests in producing properties.   Accordingly, the net

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

15

production below will be production that is owned by the Company, after deducting royalty and other similar interests.

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2015** | | **2014** |
| **Production:** | | | |
| Oil (MBbls) | | | |
| Wilmington Field | 980.3 | | 1,118.3 |
| Total | 980.3 | | 1,118.3 |
| | | | |
| Natural Gas (MMcf) | | | |
| Marcellus | 22,943.3 | | 9,784.8 |
| Atlantic Rim | 4,709.8 | | 5,897.0 |
| Other | 380.2 | | 403.0 |
| Total | 28,033.3 | | 16,084.8 |
| **Production:** | | | |
| Total MBoe[5] | 5,652.5 | | 3,799.1 |
| **Average Sales Price Per Unit:** | | | |
| Oil (per Bbl) | $ 41.14 | $ | 86.02 |
| Natural gas (per Mcf) | $ 1.55 | $ | 3.06 |
| | | | |
| Weighted average sales price (per Boe) | $ 14.81 | $ | 38.27 |
| **Expenses (per Boe):** | | | |
| Lease operating expense[6] | $ 8.76 | $ | 12.73 |

44.     The Company sells its oil and natural gas to various purchasers in the areas where the oil and natural gas is produced.  The Company's revenues are highly dependent upon the prices of, and demand for, oil and natural gas.  The markets for oil and gas have historically been volatile and are likely to continue to be volatile in the future, making the price the Company

---

[5]  Natural gas reserves are converted  to oil reserves using a ratio of six Mcf (one thousand cubic feet of natural gas at standard atmospheric conditions) to one Bbl (one stock tank barrel, or 42 gallons of liquid volume of oil or liquid hydrocarbons).  This ratio does not assume price equivalency of oil and gas.

[6]  Lease operating expenses related to the Company's CBM operations include costs for operating the Company's commercially productive CBM wells, together with the costs for operating the Company's CBM wells that are still in the dewatering phase and are not yet commercially productive.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

receives subject to fluctuations and dependent on numerous factors beyond the Company's control.

45.     For 2015, the largest purchasers and marketers of the Company's oil and gas production were Clearwater Enterprises, Phillips 66 Company and Devlar Energy, which accounted for 41%, 48% and 9%, respectively, of the Company's total production sold.

46.     The Company's oil production located in California, which is heavy crude, is sold into a transportation pipeline which delivers such production to Phillips 66 Company.  Phillips 66 Company operates a refinery in nearby Carson, California where the heavy oil is refined.  The market price for California crude oil differs from and is lower than the established market indices for the price of oil, due principally to the higher transportation and refining costs associated with heavy oil.

47.     The Company's natural gas production in Pennsylvania and Wyoming is delivered into natural gas pipelines for transportation and is sold to various purchasers for later re-marketing or end use.  The majority the natural gas is sold under monthly contracts that allow for periodic adjustments in pricing according to market demands.  In the Marcellus Shale, the Company's natural gas is sold at the Tennessee Gas Pipeline (TGP, Zone 4) or the Transco-Leidy Line at market price less transportation fees.  In the Atlantic Rim of the Washakie Basin, Wyoming, the Company's natural gas is sold at the CIG market price less transportation fees.

**E.     Business Operations.**

48.     The Company is an independent exploration and production company engaged in the acquisition, exploration, production, development and exploitation of crude oil and natural gas properties.  The Company's principal executive offices (where the CEO and CFO reside) are

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

17

located in Houston, Texas, with operational offices in California, Colorado, Wyoming and Pennsylvania.  The Company has approximately 64 employees, all of whom are employed and paid by Warren between its various offices and locations as follows: (i) 27 employees in California; (ii) 19 in Wyoming; (iii) 11 in Colorado; (iv) 4 in Pennsylvania; and (v) 3 in Texas.

### G.        The Company's Capital Structure[7]

49.        As of the Petition Date, the Debtors had long-term funded debt of approximately $486.3 million as shown below:

**Capitalization Summary**

| | Balance as of 06/02/2016[8] |
|---|---:|
| Prepetition First Lien Credit Agreement | $    247.9 |
| Prepetition Second Lien Credit Agreement | 56.9 |
| Convertible Debenture | 1.6 |
| **Total Secured Debt** | **$    306.4** |
| | |
| 9.00% Senior Notes due 2022 | $    179.9 |
| **Total Unsecured Debt** | **$    179.9** |
| **Total Debt** | **$    486.3** |

Only the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement are claims secured by collateral.  The Senior Notes are unsecured claims.  However, due to the current oil and gas pricing environment, the Debtors believe that the claims under the Prepetition First Lien Credit Agreement are undersecured and the claims under the Prepetition Second Lien Credit Agreement are completely unsecured.

---

[7] The Debtors reserve their rights concerning the claim amounts in the capital structure set forth herein, including, but not limited to, the inclusion of any interest and make-whole amounts.

[8] Claim balances include make whole and accrued interest as of June 2, 2016.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

50.     Beginning in May 2015, the Company undertook a series of transactions to address its then existing capital structure.  These transactions included entry into the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement and the related exchange of Unsecured Notes discussed below.

### 1.     Prepetition First Lien Credit Agreement

51.     On May 22, 2015, Warren entered into a first lien credit agreement (the "Prepetition First Lien Credit Agreement") by and among Warren, Wilmington Trust, National Association, as Administrative Agent, and the lenders from time to time party thereto (the "Prepetition First Lien Lenders"), that provides for a five-year, $250 million term loan facility which matures on May 22, 2020. The Prepetition First Lien Credit Agreement is guaranteed by Warren California, Warren E&P and Warren Marcellus (collectively the "Debtor Guarantor Parties" and together with Warren, the "Obligor Debtors") and is collateralized by substantially all of Obligor Debtors' assets, including Warren's equity interests in the Debtor Guarantor Parties.

52.     The Prepetition First Lien Credit Agreement included approximately $202.5 million of new funds.  As part of the Prepetition First Lien Credit Agreement, certain of the lenders exchanged approximately $69.6 million of the Company's previously issued Senior Notes (defined below) at a discount for approximately $47.2 million of the first lien term loans. This equated to an exchange price of approximately 65% of par value of the Senior Notes. Warren borrowed $172.5 million at closing under the Prepetition First Lien Credit Agreement for working capital and to repay its existing revolving credit facility.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

19

53.     As of the Petition Date, the Company had approximately $247.9 million outstanding under the Prepetition First Lien Credit Agreement, inclusive of accrued and unpaid interest and make-whole amounts.

### 2.     Prepetition Second Lien Credit Agreement

54.     On October 22, 2015, the Company entered into a second lien credit facility (the "Prepetition Second Lien Credit Agreement") by and among Warren, Cortland Capital Market Services, LLC, as Administrative Agent, and the lenders from time to time party thereto (the "Prepetition Second Lien Lenders").  The Prepetition Second Lien Credit Agreement provides for a five-year, approximately $51.0 million term loan facility that matures on November 1, 2020.

55.     The Prepetition Second Lien Credit Agreement provided Warren with approximately $11 million of new money to fund its operations.  Along with providing new money, the Prepetition Second Lien Lenders exchanged approximately $63.1 million in face value of Senior Notes held by them, plus accrued interest.  The Prepetition Second Lien Lenders received the following in exchange for the Senior Notes (i) approximately $40.1 million of second lien term loans under the Second Lien Facility, and (ii) four million (4,000,000) shares of Warren's common stock.  In conjunction with the $11 million of new money, Warren also drew down $10 million on the Prepetition First Lien Credit Agreement, providing Warren with approximately $20 million of liquidity.

56.     The Prepetition Second Lien Credit Agreement is guaranteed by the Debtor Guarantor Parties on substantially similar terms as the guarantees related to the Prepetition First Lien Credit Agreement and is collateralized by second-priority liens on substantially all of

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

20

Warren's assets, including Warren's equity interests in the Debtor Guarantor Parties, and the assets of the Debtor Guarantor Parties, to the extent such assets or interests secure the Prepetition First Lien Credit Agreement.[9]   As of the Petition Date, the Company had approximately $56.9 million outstanding borrowings under the Prepetition Second Lien Credit Agreement, inclusive of accrued and unpaid interest and make-whole amounts.

### 3.    9.000% Senior Notes

57.    To finance the acquisition of the Marcellus Pennsylvania assets, the Company issued 9.000% senior notes in a private offering at a price equal to 98.617% of the $300 million principal amount thereto, due to mature on August 1, 2022 (the "Unregistered Senior Notes"). The net proceeds from this notes offering were used to fund a portion of the $312.5 million cash consideration for the purchase price of the Marcellus assets acquired from Citrus Energy Corporation and two other working interest owners for $352.5 million.

58.    As noted above, in connection with the Prepetition First Lien Credit Agreement entered into on May 22, 2015, Warren exchanged $69.59 million in face value of the Unregistered Senior Notes previously held by the lenders under the Prepetition First Lien Credit Agreement for approximately $45.23 million of First Lien Term Loans.

59.    On July 27, 2015, substantially all of the outstanding Unregistered Senior Notes were exchanged for an equal principal amount of registered 9.000% Senior Notes due 2022 (the "Registered Senior Notes" and, together with the Unregistered Senior Notes, the "Senior Notes"). The Registered Senior Notes are identical to the Unregistered Senior Notes except that

---

[9] There were certain Wyoming oil and gas leases and wells added to a supplemental mortgage in favor of the Prepetition First Lien Lenders that have not been added to any mortgages in favor of the Second Lien Lenders.  So the collateral packages for the Prepetition First Lien Lenders and the Second Lien Lenders do not completely overlap.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

21

the Registered Senior Notes are registered under the Securities Act and do not have restrictions on transfer, registration rights or provisions for additional interest.

60.     Further, as discussed above, on or about October 22, 2015, in connection with the Prepetition Second Lien Credit Agreement, Warren exchanged approximately $63.1 million in face value of the  Senior Notes, plus accrued interest, for (i) approximately $40.1 million of second lien term loans, and (ii) four million (4,000,000) shares of Warren common stock with a fair market value of $2 million.

61.     The Senior Notes are jointly and severally guaranteed on an unsecured basis by substantially all of Warren's existing subsidiaries (except for Warren Energy and Warren Management Corp.).  As of the Petition Date and after giving effect to the exchanges discussed above, there is approximately $179.9 million in Senior Notes outstanding inclusive of accrued interest.

### 4.     Convertible Debenture

62.     There is approximately $1.6 million outstanding under convertible secured debentures that are convertible into common stock of Warren.  Specifically, approximately $835,000 is outstanding under the 12% Convertible Secured Debenture due December 31, 2020 and approximately $801,000 is outstanding under the 12% Convertible Secured Debentures due December 31, 2022.

### 5.     Preferred Stock

63.     As of December 31, 2015, Warren had 10,703 shares of convertible preferred stock issued and outstanding.  The preferred stock is convertible into common shares on a 1 to 1 and 1 to 0.5 basis.  Dividends on preferred shares totaled approximately $10,000 and for each of

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

22

the years ended December 31, 2015 and 2014.  All of Warren's outstanding preferred stock has a dividend equal to 8% per annum, payable to the extent legally available quarterly in arrears, and has a liquidation preference of $12.00 per share.

### 6.    Common Stock

64.    Warren's common stock is listed on the NASDAQ Global Market ("NASDAQ") under the symbol "WRES."  As of April 30, 2016, there were 85,250,025 shares of common stock issued and outstanding and there were approximately 1,800 record holders of Warren's common stock.

### 7.    Hedges

65.    A significant percentages of the Company's estimated volumes are hedged through 2016 (274,000 bbls of oil and 14.3 Bbtu of natural gas) with Shell Trading Risk Management LLC and Cargill Risk Management serving as the hedge counterparties.  Such hedges remain in place and the Company estimates that if such hedges were terminated, the Company would be "in the money" and receive a payment from the hedge counterparties.

## II.    Events Leading to these Chapter 11 Cases.

66.    Oil prices have fallen significantly over the last 18 months.  Warren is in payment default under the Senior Notes, triggering cross defaults under the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement, and Warren has been unable to raise additional capital to refinance these obligations.  Nor does the Company have the capital to continue a well drilling program to develop its proven undeveloped oil and gas reserves or the liquidity sufficient to pay its operational expenses and debt service obligations.  Unless the

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

23

Company replaces the reserves it produces through successful development, exploration or acquisition activities, the Company's proved reserves and production will decline over time.

### A. Rapid Drop in Oil and Gas Prices and Sustained Low Prices

67.     Oil and gas prices have plummeted and remain low over the last two years.  The per-barrel price for Brent crude oil fell from more than $100 per barrel in September 2014 to less than $30 per barrel in January 2016.  Recently, the per-barrel price of crude oil has traded between $45 and $50 per barrel.

68.     Likewise, gas prices have declined dramatically during this time.  Natural gas prices were approximate $4.00 per million Btu in September 2014 to approximately $2.00 per million BTU at the present time.  There remains great uncertainty in the oil and gas market with a number of industry experts predicting continued depressed prices throughout 2016.

69.     This decline in oil and gas prices has significantly impacted the Company's revenues.  The Company's revenue from oil and gas sales decreased $61.6 million during 2015 to $83.7 million, a 42% decrease compared to 2014.  Specifically, net gas production for 2015 was 28 Bcf, an increase over production in 2014 which was 16.1 Bcf.  However, the average realized price per Mcf of gas for 2015 fell approximately 50% to $1.55 as compared to $3.06 in 2014.

70.     Similarly, the drop in oil process significantly impacted revenue from oil sales. Net oil production for 2015 declined to .98 MMBbls  from 1.1 MMBbls in 2014, while the average realized price per barrel of oil for 2015 was $41.14 as compared to $86.02 in 2014. With the precipitous drop in oil and gas prices significantly reducing the Company's revenues,

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

24

the Company is no longer able to service its debt obligations and meet operational expenses, let alone further develop it assets, without a financial restructuring.

**B.    Payment Default on Senior Notes and Cross Defaults on Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement**

71.    In light of prevailing oil prices and the necessity of a debt restructuring, Warren elected to not make the approximately $7.5 million interest payment due February 1, 2016 on its Senior Notes.  The applicable 30-day grace period for such interest payment expired on March 2, 2016 and consequently an event of default under the indenture governing the Senior Notes has occurred and is continuing.

72.    In addition, this default status on the Senior Notes has resulted in events of default under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement, entitling the administrative agents and lead lenders thereunder to declare all obligations under those credit facilities to be immediately due and payable.  However, thus far, no such acceleration of Warren's debt obligations has occurred.

**C.    DIP Loan and Restructuring Support Agreement with Prepetition First Lien Lenders and Ad Hoc Committee**

73.    The Company initiated discussions with the Plan Sponsor, Claren Road and the Ad Hoc Committee starting in January 2016.  Such discussions included unilateral discussions with such constituents as well as discussions including all parties concerning a consensual restructuring.  As a consensual restructuring with all members of the capital structure became less likely, the Company focused its negotiations on the Plan Sponsor.  The Company and Plan Sponsor negotiated in good faith and at arm's length for several weeks over the terms contained in the Restructuring Support Agreement, exchanging several draft term sheets and having

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

25

numerous conference calls and conversations negotiating the terms.   During this time, the Company maintained an open line of communication with the Prepetition Second Lien Lenders and Ad Hoc Committee and informed them of the state of the negotiations.

74.     The Company also received and discussed restructuring proposals from the Ad Hoc Committee and Claren Road during this time and attempted to facilitate discussions with the various constituents and bridge the gaps that existed between the competing proposals.   After several weeks, the Plan Sponsor, Ad Hoc Committee and the Company agreed to the terms of the Restructuring Support Agreement.   The Debtors believe that it is in the best interest of all parties to resolve the outstanding issues with Claren Road and will continue to negotiate with Claren Road postpetition.

75.     Pursuant to the terms of the agreed restructuring and as more fully described in the Restructuring Support Agreement and related documents, the Prepetition First  Lien Lenders will convert their outstanding claims in to a new first lien exit facility the amount of $130 million (plus, at the Plan Sponsor's option, any outstanding amounts on the DIP Financing) and 82.5% of the equity in the reorganized debtors.   The remaining 17.5% of equity in the reorganized debtors will be divided, *pro rata*, among the Prepetition Second Lien Lenders, Senior Noteholders and Citrus Energy.   General unsecured creditors will receive a discounted cash payment equal to the economic value received by the Prepetition Second Lien Lenders, Senior Noteholders and Citrus Energy based on the value of the equity.   Existing equity in Warren will be cancelled.

76.     As part of the Restructuring Support Agreement, the Plan Sponsor also agreed to provide debtor-in-possession financing ("DIP Financing") to the Company.  The DIP Financing,

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

26

along with cash collateral, will be used to fund the Debtors' reorganization efforts.  Currently, the Debtors have over $10 million of cash constituting the Cash Collateral of the Prepetition First Lien Lenders in accounts at JPMorgan Chase Bank.  Approximately $10 million of such cash is in a restricted account which can only be released from the account and used with the consent of the Prepetition First Lien Lenders (the "Restricted Cash").  The Prepetition First Lien Lenders have consented to the use of the Restricted Cash as part of the Debtors cash collateral in accordance with the terms of the agreed budget.

77.     The DIP Facility is comprised of a delayed draw term loan facility in an aggregate principal amount of up to $20 million. At this time, the Debtors do not anticipate need to draw on the DIP Facility in the immediate future and, as such, are not seeking interim approval of the DIP Facility.  The Debtors are only seeking interim use of cash collateral.

78.     Any draws on the DIP Facility will be advanced on a superpriority administrative claim basis and be secured by, subject to a carve-out, perfected first priority "priming" security interest on all prepetition and postpetition collateral of the Debtors.  Additionally, as adequate protection for the use of the Restricted Cash, replacement liens and a superpriority administrative expense claim will be provided for any diminution in value of the Prepetition First Lien Lenders' collateral.  The Prepetition Second Lien Lenders will likewise be granted replacement liens and a superpriority administrative expense claim, subordinate in all respects to the liens and claims of the Prepetition First Lien Lenders, as adequate protection.  Further, the fees and expenses of counsel and advisors for the Prepetition First Lien Lenders will be paid current as part of the adequate protection package, as will interest under the Prepetition First Lien Credit Agreement.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

27

79.     Significantly, an intercreditor agreement (the "Prepetition Intercreditor Agreement") exists governing the rights by and among the Prepetition First Lien Lenders and Prepetition Second Lien Lenders, including their respective rights in the event of a bankruptcy. Pursuant to the Prepetition Intercreditor Agreement, the Prepetition Second Lien Lenders cannot contest the Company's use of cash collateral if the Prepetition First Lien Lenders have consented and the Prepetition Second Lien Lenders are provided certain forms of adequate protection which is being provided under the interim cash collateral order.   Accordingly, because the Prepetition First Lien Lenders have consented to and the Prepetition Second Lien Lenders are prohibited from contesting the use of cash collateral by the Prepetition Intercreditor Agreement, the Debtors' proposed use of cash collateral is uncontested.

80.     As a condition to receiving the DIP Financing, the Company agreed to certain milestones for the restructuring process that, if not met or waived by the Plan Sponsor, would result in a default under the DIP Financing.  Such milestones are detailed in the Restructuring Support Agreement and provide deadlines for approval of the DIP Financing on a final basis, submission and approval of a disclosure statement consistent with the terms of the Restructuring Support Agreement and submission and approval of a chapter 11 plan of reorganization consistent with the terms of the Restructuring Support Agreement.

81.     Each of the foregoing factors, among others, contributed to the Company's decision to seek relief under chapter 11 of the Bankruptcy Code.  The Company intends to restructure its debts and reorganize its business to provide the greatest possible recovery for the estates and stakeholders.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

28

### III.    Evidentiary Support for First Day Motions.

82.    As discussed above, the Company has entered into chapter 11 with the goal of restructuring its debts to maximize value for all of its stakeholders.  To that end, concurrently with the filing of its chapter 11 petitions, the Company has filed a number of First Day Motions seeking relief that the Company believes is necessary to enable it to operate with minimal disruption and loss of productivity and protect and preserve its going concern value.  The Company requests that the relief sought in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Company's operations during the pendency of, these chapter 11 cases.

83.    I have reviewed the facts set forth in each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.[10]

### A.    Debtors' Emergency Motion for Entry of Orders (I) Authorizing Use of Cash Collateral on an Interim and Final Basis, (II) Approving Postpetition Financing on a Final Basis, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay and (VI) Scheduling a Final Hearing (the "DIP/CC Motion").

84.    The Company requests authority to use Cash Collateral on an interim basis and incur post-petition debtor-in-possession financing and use Cash Collateral on a final basis on the terms set forth in the DIP/CC Motion.  The use of Cash Collateral on an interim and final basis and approval of DIP Financing is vital to the Company's continued operations and the preservation of value for all creditors and parties in interest.  The DIP/CC Motion and the

---

[10] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

29

exhibits attached thereto contain a description of the key terms of the use of Cash Collateral and DIP Financing. I hereby adopt and incorporate the description from the DIP/CC Motion as if fully set forth herein.

85.    Specifically, the Company requests entry of an interim order authorizing the Company to immediately use cash collateral to avoid immediate and irreparable harm. The Debtors have over $10 million in cash available for use with the consent of the Prepetition First Lien Lenders. As such, it is not anticipated that the Debtors will need to use the DIP Financing on an interim basis, and only seek final approval of the DIP Financing. Absent immediate use of Cash Collateral, however, the Company will not be able to pay its employees or fund operating expenses, putting its operations and assets at substantial risk.

86.    The DIP Financing will be used to fund the Company's ongoing operating expenses and the administrative expenses of the bankruptcy cases as the Company pursues the restructuring set forth in the Restructuring Support Agreement. I believe that the relief requested in the DIP Motion, including the immediate use of Cash Collateral, is in the best interests of the Company's estates, its creditors, and all other parties in interest, and will enable the Company to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of the Company, I respectfully submit that the DIP/CC Motion should be approved.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

30

**B.  Emergency Motion for Entry of an Order (I) Authorizing Payment of Prepetition Employee Obligations and Related Amounts, (II) Confirming Right of Debtors to Continue Employee Programs on Postpetition Basis, (III) Confirming Right of Debtors to Pay Withholding and Payroll-Related Taxes and (IV) Directing Banks to Honor Prepetition Checks for Employee Obligations (the "<u>Wages and Benefits Motion</u>").**

87.    The Company requests the authority, in its sole discretion, to pay prepetition claims, honor obligations, and to continue programs, in the ordinary course of business and consistent with past practices, relating to the Pre-Petition Employee Obligations (as defined in the Wages and Benefits Motion).  I have reviewed the Wages and Benefits Motion and I am familiar with description of the programs and benefits described therein and the payments made pursuant to such programs.  Such descriptions are true and correct to the best of my knowledge and I hereby adopt and incorporate such descriptions as if fully set forth herein.

88.    As of the Petition Date, the Debtors' aggregate workforce consists of approximately 64 Employees.  All of the Employees are employed by Warren, with 39 of the Employees employed on a salaried basis and the remaining Employees employed on an hourly basis.

89.    The majority of the Company's Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Company is not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.   Moreover, if the Company is unable to satisfy such obligations, Employee morale, focus and loyalty will be jeopardized at a time when Employee support is critical to the Company.  In the absence of such payments, the Company believes its Employees will seek alternative employment opportunities, perhaps with the Company's competitors,

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

31

thereby hindering the Company's ability to meet its obligations, diminishing creditors' confidence in the Company, and slowing down the reorganization process. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Company should be focusing on stabilizing its operations as it works to reorganize its business.

90. I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Company's estates, its creditors, and all other parties in interest, and will enable the Company to continue to operate its businesses in chapter 11 without disruption. Accordingly, on behalf of the Company, I respectfully submit that the Wages and Benefits Motion should be approved.

**C.    Emergency Motion for Authority to Pay in the Ordinary Course  Undisputed Prepetition Royalties and Working Interests and Continue such Payments in the Ordinary Course (the "Royalty Motion").**

91. The Company requests entry of an order authorizing the Company to pay in the ordinary course the prepetition claims of Royalty Interest Holders and Working Interest Holders and continue such payments postpetition. I have reviewed the Royalty Motion and I am familiar with the description of the Company's oil and gas operations and the consequences for failure to pay Royalties and Working Interests on account of such operations as set forth therein. Such descriptions are true and correct and I hereby adopt and incorporate such descriptions as if fully set forth herein.

92. As an oil and gas exploration and production company, payment to Royalty Interest Holders and Working Interest Holders on a timely basis is vital to the continued operation of the Company's business. Failure to timely pay such amounts due under oil and gas

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

32

leases and operating agreements can lead to potential lease forfeiture or substantial penalties under such agreements which would adversely affect the Company's operations to the detriment of all parties in interest.  Additionally, failure to timely pay such amounts could prevent the Company from obtaining future leases as its failure to pay Royalty Interest Holders and Working Interest Holders could negatively impact the Company's reputation.  Accordingly, payment of such obligations is vital to the continued operation of the Company's business in order to maintain value.

93.      I believe that the relief requested in the Royalty Motion is in the best interests of the Company's estates, its creditors, and all other parties in interest, and will enable the Company to continue to operate its businesses in chapter 11 with the least amount of disruption possible.  Accordingly, on behalf of the Company, I respectfully submit that the Royalty Motion should be approved.

**D.      Emergency Motion for Entry of Order Authorizing the Payment of Working Interest Costs, Joint Interest Billings and Production Sale Expenses (the "<u>Obligations Motion</u>")**

94.      The Company requests entry of an order authorizing the Company to pay in the ordinary course undisputed working interest costs, joint interest billings and production sale expenses.  I have reviewed the Obligations Motion and I am familiar with description of the Company's oil and gas operations and the consequences for failure to pay Working Interest costs, Joint Interest Billings and Production Sale Expenses (each as defined in the Motion and collectively, the "<u>Oil and Gas Obligations</u>") on account of such operations as set forth therein. Such descriptions are true and correct and I hereby adopt and incorporate such descriptions as if fully set forth herein.

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

33

95.     As an oil and gas exploration and production company, payments of the Oil and Gas Obligations on a timely basis is vital to the continued operation of the Company's business. Failure to timely pay Joint Interest Billings and other amounts due under oil and gas leases can lead to potential lease forfeiture or substantial penalties under such leases and contracts which would adversely affect the Company's operations to the detriment of all parties in interest.

96.     Similarly, as operator of a substantially all of the Debtors oil and gas assets through Warren E&P, Inc., the Company is obligated under Joint Operating Agreements and other similar agreements to pay for the costs of operating the oil and gas wells and then submit Joint Interest Billings to the Non-Op Working Interest Holders for reimbursement.  Failure to pay certain materialmen and workmen who provide services for the Company as operator of these assets could give rise to statutory liens under applicable non-bankruptcy law against both the Company's interest and the Non-Op working Interest.

97.     Likewise, the Company is obligated to pay certain Production Sale Expenses, such as transporting, storing, and marketing of oil and gas, as well as treating, dehydrating, compressing and processing oil and gas.  Such Production Sale Expenses are sometimes incurred in the Company's role as operator or billed to the Company through Joint Interest Billings. Many of the parties who provide such services may likewise have statutory lien rights or otherwise refuse to provide services if not timely paid.

98.     Resolution of such potential lien claims and disputes relating to the Oil and Gas Obligations would be time-consuming and could result in expensive litigation.  Moreover, such service providers could refuse to provide subsequent services necessary to continued operations.

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

34

Accordingly, the Company requests authorities to pay undisputed amounts owed to such workers to avoid issues related to potential liens.

99.     I believe that the relief requested in the Obligations Motion is in the best interests of the Company's estates, its creditors, and all other parties in interest, and will enable the Company to continue to operate its businesses in chapter 11 with the least amount of disruption possible.   Accordingly, on behalf of the Company, I respectfully submit that the Obligations Motion should be approved.

      **E.**      **Emergency Motion for Order (I) Authorizing the Continued Use of Existing Bank Accounts, Business Forms and Cash Management System; (II) Waiving Requirements of Section 345 of the Bankruptcy Code; and (III) Authorizing Continuation of Intercompany Transactions (the "<u>Bank Account Motion</u>").**

100.     The Company requests the authority to: (a) continue to use, with the same account numbers, all of the Bank Accounts in its Cash Management System; (b) use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to their status as debtors in possession; and (c) continue performing intercompany transactions in the ordinary course of business.   I have reviewed the Bank Accounts Motion and I am familiar with description of the accounts and cash management system set forth therein.   Such descriptions are true and correct and I hereby adopt and incorporate such descriptions as if fully set forth herein.    The Company has at least $10 million of cash across its various accounts.

101.     In addition, the Company further requests that the Court authorize the banks to: (a) continue to maintain, service, and administer the bank accounts and (b) debit the bank accounts in the ordinary course of business on account of checks drawn on the bank accounts

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

35

that are presented for payment at the banks or exchanged for cashier's checks prior to the Petition Date.

102.     In the ordinary course of business, the Company utilizes an integrated Cash Management System to collect, transfer, and disburse funds generated by its operations and maintains current and accurate accounting records of all daily cash transactions.  If the Company was required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would disrupt the Company's business at this critical time.  The Company respectfully submits that parties in interest will not be harmed by its maintenance of the existing cash management system, including its Bank Accounts, because the Company has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.  The Company does not have any overnight investment practices, and all its accounts are insured by the Federal Depository Insurance Company.

103.     In addition, in the ordinary course of business, the Company enters into certain intercompany transactions as necessary to ensure the business runs smoothly.   If the intercompany transactions are discontinued, a number of services provided by and to the Company would be disrupted and could affect the Company's ability to pay wages and benefits to its employees and make timely payments to vendors.

104.     The relief requested in the Bank Account Motion is vital to ensuring the Company's seamless transition into bankruptcy.  Authorizing the Company to maintain its Cash

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

36

Management System will avoid many of the possible disruptions and distractions that could divert its attention from more critical matters during the initial days of these chapter 11 cases.

105.    I believe that the relief requested in the Bank Account Motion is in the best interests of the Company's estates, its creditors, and all other parties in interest, and will enable the Company to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of the Company, I respectfully submit that the Bank Account Motion should be approved.

**F.    Emergency Motion to Extend the Time to File Schedules, Statements of Financial Affairs, and Lists of Equity Holders (the "Schedules and Statements Motion")**

106.    The Company requests entry of an order granting the Company an additional 31 days, for a total of 45 days, to file their schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules and Statements") without prejudice to receiving a subsequent extension.

107.    The Company and its wholly-owned subsidiaries have a substantial number of creditors and parties-in-interest and conduct their business operations from several locations in the United States.  Completion of the Schedules and Statements will require an expenditure of a significant amount of time and effort by the Company's employees.  Many of those employees have been and will continue to be simultaneously working on other aspects of the Company's bankruptcy efforts and endeavoring to stabilize operations by addressing the myriad of employee, customer and vendor issues raised by the chapter 11 filings.

108.    I believe that the relief requested in the Schedules and Statement Motion is in the best interests of the Company's estates, its creditors, and all other parties in interest, and will

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

37

enable the Company to continue to operate its businesses in chapter 11 with the least amount of disruption possible.  Allowing for the thirty-one day extension (for a total of 45 days to file the Schedules and Statements) will allow the Company and its employees to focus on the transition to operating in chapter 11 and still ensure that the information from the Schedules and Statements is provided in a timely manner.   Accordingly, on behalf of the Company, I respectfully submit that the Schedules and Statement Motion should be approved.

### G.   Emergency Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payments (the "Utilities Motion").

109.   In the ordinary course of business, the Company incurs expenses for gas, water, sewer, electric, telecommunications, internet access, and other similar utility services provided by utility providers. Uninterrupted utility services are essential to the Company's ongoing operations and, therefore, to the success of its reorganization.  Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Company's operations, customer relationships, and revenues, seriously jeopardizing the Company's reorganization efforts and, ultimately, creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

110.   The Company requests the entry of interim and final orders: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Company's proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Company's proposed adequate assurance pending entry of the Final Order;

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

38

and (d) determining the Company is not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion, pending entry of the Final Order.  The Company proposes to only have a final hearing on the Utilities Motion if an objection is received and cannot be resolved.

111.    I believe and am advised that the proposed procedures are necessary in these chapter 11 cases, because if such procedures were not approved, the Company could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these chapter 11 cases.  Moreover, a Utility Provider could blindside the Company by unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately assured of future performance and discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of utility service could shut down operations, and any significant disruption of operations could jeopardize a successful reorganization in these chapter 11 cases.

112.    I believe that the relief requested in the Utilities Motion is in the best interests of the Company's estates, its creditors, and all other parties in interest, and will enable The Company to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of the Company, I respectfully submit that the Utilities Motion should be approved.

**H.      Debtors' Emergency Motion for Entry of (I) Interim and Final Orders Establishing Notification Procedures Regarding Restrictions on Certain Transfers of Stock in Warren Resources, Inc. and (II) Order Scheduling a Final Hearing ("Equity Trading Motion").**

113.    The Company requests entry of an order authorizing setting forth certain procedures to restrict trading in Stock of Warren.  I have reviewed the Equity Trading Motion

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

39

and I am familiar with the description of the procedures and the Company's Stock contained therein.  Such descriptions are true and correct and I hereby adopt and incorporate such descriptions as if fully set forth herein.

114.    The company generates net operating losses ("<u>NOLs</u>" and together with certain other tax attributes, the "<u>Tax Attributes</u>") if the operating expenses it has incurred exceed the revenues it has earned during a single tax year.  The Internal Revenue Code (the "<u>Internal Revenue Code</u>") permits a company to apply, or "carry forward" NOLs to reduce future tax payments in a tax year or years up to 20 years after the year in which the NOLs were generated (subject to certain conditions discussed below).  The Company has approximately $327 million of NOLs as of December 31, 2015 and certain other Tax Attributes that can be applied against future tax payments.

115.    I am familiar with the description of sections 382 and 383 of the Internal Revenue Code set forth in the Equity Trading Motion.  Essentially, if an "ownership change" occurs as described in the Equity Trading Motion, the Debtors ability to use the Tax Attributes, including NOLs, to offset against future tax payments may be compromised.

116.    In light of this potential risk, the Company believes that it is prudent to implement the procedures set forth in the Equity Trading Motion that establish certain notification and hearing procedures related to certain transfers of Warren's Stock.  The proposed procedures provide a mechanism for the Debtors to monitor and, if necessary, object to certain transfers of Stock to ensure preservation of Tax Attributes.  In light of the value of the Tax Attributes to the Debtors estates, I believe that the proposed procedures set forth in Equity Trading Procedures Motion are in the best interests of the Debtors' estates, their creditors and parties in interests and

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

40

will enable the Debtors to maximize the value of the Tax Attributes for the benefit of all stakeholders.

### I.    Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to Implement Certain Notice Procedures (the "<u>Notice Procedures Motion</u>")

117.    The Company requests entry of an order authorizing the Company to implement certain notice procedures designed to reduce the administrative burden on the Debtors while still providing notice of events in the case to parties-in-interest.   I have reviewed the Notice Procedures Motion and I am familiar with the description of the proposed procedures.

118.    A large number of creditors and parties in interest may be entitled to receive notice in these cases under the Bankruptcy Rules.   As such, service of all documents filed in these cases to each creditor and party in interest would be extremely burdensome and costly to the estates.   The Company, therefore, requests entry of an order limiting notice to the Master Service List, which will be established in accordance with the Court's complex case procedures and rules.

119.    The proceedings with respect to which notice would be limited to the Master Service List would include all matters covered by Bankruptcy Rule 2002, with the express exception of the following: (a) notice of (i) the first meeting of creditors pursuant to section 341 of the Bankruptcy Code, (ii) the time fixed for filing proofs of claim pursuant to Bankruptcy Rule 3003(c), (iii) the time fixed for filing objections to, and the hearings to consider, approval of a disclosure statement and confirmation of a plan of reorganization, (iv) the time fixed for filing objections to, and the hearings to consider any motion seeking approval of a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code or any bid procedures or related relief with respect to such a sale transaction; and (b) notice and transmittal

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

41

of ballots for accepting or rejecting a plan of reorganization. Notice of the foregoing matters would be given to all parties in interest in accordance with Bankruptcy Rule 2002, unless the Court orders, or the Bankruptcy Code prescribes, otherwise.

120.    Accordingly, I believe that the relief requested in the Notice Procedures Motion is in the best interests of the Company's estates, its creditors, and all other parties in interest.  The proposed procedures will promote efficiency in these cases and help the estates avoid substantial administrative costs while still providing notice to a substantial number of creditors and parties in interest, including any parties in interest that affirmatively request to receive notice. Accordingly, on behalf of the Company, I respectfully submit that the Notice Procedures Motion should be approved.

**J.      Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and a Consolidated List of the 30 Largest Unsecured Creditors and (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information (the "Creditor Matrix Motion")**

121.    Pursuant to the Creditor Matrix Motion, the Debtors request entry of an order (i) authorizing the Debtors to file a consolidated creditor matrix and consolidated list of the 30 largest general unsecured creditors; and (ii) approving the form and manner of notice of commencement of these chapter 11 cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

122.    The Debtors operate as one integrated company.  Requiring the Debtors to segregate and convert records to a Debtor-specific matrix format would be unnecessarily burdensome task on the employees of the Company that could result in duplicate mailings across Debtors.  By maintaining a consolidated matrix, all parties will still receive notice of various

DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

42

matters without the additional burden on the Company.   I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Company's estates, its creditors, and all other parties in interest, and will enable the Company to continue to operate its businesses in chapter 11 with the least amount of disruption possible.  Accordingly, on behalf of the Company, I respectfully submit that the Creditor Matrix Motion should be approved.

  **K.**  **Emergency Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "<u>Joint Administration Motion</u>")**

  123. The Company requests entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  The Company requests that the Court maintain one docket for all of these chapter 11 cases under the case of Warren Resources, Inc. and also requests that an entry be made on the docket of each of the Company's chapter 11 cases, other than Warren Resources, Inc. to reflect the joint administration of these chapter 11 cases.

  124. Given the integrated nature of the Company's operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect Warren Resources, Inc. and each of its subsidiaries that also have filed chapter 11 cases.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

  125. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Company's estates, its creditors, and all other parties in interest, and will enable

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

the Company to continue to operate its businesses in chapter 11 with the least amount of disruption possible.  Accordingly, on behalf of the Company, I respectfully submit that the Joint Administration Motion should be approved.

**L.      Emergency Motion for an Order (A) Fixing Claims Bar Date for the Filing of Proofs of Claim; (B) Fixing the Governmental Unit Bar Date for the Filing of Proofs of Claim by Governmental Units; (C) Approving the Form and Content of the Bar Date Notices; (D) Approving the Method and Manner of Disseminating the Bar Dates Notices and the Publication Notices; and (E) Granting Related Relief  (the "<u>Bar Date Motion</u>")**

126.     The Company requests entry of an order fixing a bar date for filing proofs of claim and the manner of disseminating notice of such bar date, including publication notice, on parties in interest.  I have read the Bar Date Motion and am familiar with the proposed method and procedures for serving the bar date notice and publishing the notice

127.     I believe the proposed procedures for noticing the bar date are designed to notify all potential parties in interest in an efficient manner and provide such parties with notice of the applicable bar date and an opportunity to file a proof of claim.  Sending the bar date notice to known creditors and publishing the bar date notice in the manner described in the motion should allow the Company to notify parties-in-interest, whether known or unknown, of these cases and time for filing a proof of claim.

128.     I believe that the relief requested in the Bar Date Motion is in the best interests of the Company's estates, its creditors, and all other parties in interest, and will enable the Company to continue to operate its businesses in chapter 11 with the least amount of disruption possible.  Accordingly, on behalf of the Company, I respectfully submit that the Bar Date Motion should be approved.

*[Remainder of Page Intentionally Left Blank]*

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.***, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June  2  , 2016
Houston, Texas

James A. Watt
President, Chief Executive Officer and Chief Restructuring
Officer of Warren Resources, Inc., *et al.*

**DECLARATION OF JAMES A. WATT, PRESIDENT, CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER OF WARREN RESOURCES, INC.,** *ET AL.*, **IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**